**John R. CARKHUFF et ux., Petitioners-Appellants,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.**

**No. 19788.**

United States Court of Appeals, Sixth Circuit.

May 7, 1970.

Harlan Pomeroy, Cleveland, Ohio, Oakley V. Andrews, George Downing, Baker, Hostetler & Patterson, Cleveland, Ohio, on the brief, for appellants.

John A. Townsend, Department of Justice, Washington, D. C., Johnnie M. Walters, Asst. Atty. Gen., Lee A. Jackson, Elmer J. Kelsey, Nick G. Kolokathis, Attys., Department of Justice, Washington, D. C., on the brief, for appellee.

Before PHILLIPS, Chief Judge, and McCREE and BROOKS, Circuit Judges.

PHILLIPS, Chief Judge.

This is an appeal by the taxpayers from a decision of the Tax Court upholding the Commissioner's disallowance of certain deductions and the assessment of deficiencies for the years 1962–64. The memorandum opinion of the Tax Court is T.C. Memo 1969–66.

The facts are not in dispute but the tax conclusions to be drawn from them are contested earnestly. The taxpayers, John R. and Rosemary W. Carkhuff, are husband and wife, residing in Akron, Ohio. They filed joint tax returns for the tax years in question. In the latter part of 1956 taxpayers purchased residential property on Sea Island, Georgia, fronting on the Atlantic Ocean. The residence contained four bedrooms, each with bath, a two-storied living room, a dining room, pantry, kitchen, bar, storage closet, sun deck and terrace, servants' quarters consisting of two additional bedrooms with bath, and a three-car garage. The fair market value of the property, excluding furnishings, as of April 1968, was approximately $200,000 of which approximately $125,000 would be allocable to the land. The original cost of the property was $140,-

000. In computing depreciation the taxpayers allocated to the house $79,153.87 of the purchase price.

The Island is operated as a privately owned resort and attracts a substantial number of people annually. The resort period extends principally through ten months, from February through November. The peak rental period for the Cloister Hotel, the only hotel facility on the Island, extends from the latter part of April through early June and the month of September. During these months the hotel generally is booked to capacity and other guests are accommodated in nearby rental cottages.

The rental department of the Sea Island Company, which owns the hotel, maintains a listing of all the cottages on the Island which are available for rent at various periods of time. Of the some 200 cottages on the island approximately one-half are listed for rent during some part of the year. Soon after they purchased it, the taxpayers listed their cottage with the rental department as available for rent during eight months of the year. The rental department is the exclusive rental agent for the taxpayers' cottage. Although the taxpayers could rent their property personally, to do so was impractical because of certain restrictions that would be placed on the tenants under direct rental. By renting through the rental department a tenant has full use of other recreational facilities owned by the Sea Island Company.

Advertising of Sea Island is placed by the Sea Island Company in various news media, including several national magazines. The company also uses direct mail advertising. The advertisements list the services and facilities available and mention the availability of rental cottages. Specific cottages are not mentioned, nor is the cottage of taxpayers advertised individually by the company. Specific information is furnished as to taxpayers' cottage, which was identified as Cottage 83, only when a prospective tenant makes inquiry as to a cottage of a general description, e. g., "a four bedroom cottage on the waterfront." The peak rental period for the cottages covers the months of March and April and from mid-June through August. The taxpayers reserved the cottage for their personal use for the four months of February, March, April and October.

The monthly rental charge for the taxpayers' cottage has been $1,300. This charge has remained consistent during all the eight months that the cottage is available for rent. It is based upon the fair rental value of the property and is in keeping with comparable rates for similar properties on Sea Island. The rate was reviewed periodically. The rental agreement provided that the cottage would not be occupied unexpectedly by the owners, or friends, until the owner had contacted the Rental Department to determine that it had not been rented previously for conflicting periods.

The cottage was outfitted with proper facilities which would make it suitable for rental occupancy. It was furnished and otherwise equipped for use by tenants. In 1962 the house was refurbished, after a survey was made which had been prompted by a complaint from a tenant during the summer of that year. Following an inventory of recommended repairs and improvements the house was upgraded accordingly.

The taxpayers' cottage was not air conditioned, although the trend had been for the newer cottages to have built-in air conditioning. This cottage was not adaptable to air conditioning without the expenditure of substantial sums of money. It was determined that it would be impossible to install window air conditioning because of the casement windows, and that central air conditioning would be expensive and impractical because of high ceilings. The taxpayers had the casement windows on the oceanside of the living room removed and replaced by sliding glass windows to provide additional ventilation. Because of its lack of air conditioning the cottage was beginning to face more

severe competition from the newer air conditioned homes, although the rental of cottages generally showed an increase.

On their income tax returns for the years 1962–64 taxpayers reported receipts from rental of their cottage, claimed deductions for expenses and depreciation in the amounts set forth below, which resulted in the claimed losses:

| Year | Receipts Reported | Depreciation Deduction Claimed | Expense Deduction Claimed | Rental Loss |
|------|------|------|------|------|
| 1962 | $3,600.00 | $4,106.49 | $3,406.11 | $3,912.60 |
| 1963 | 2,400.00 | 4,188.21 | 3,299.84 | 5,088.05 |
| 1964 | 0 | 4,292.12 | 3,203.68 | 7,495.80 |

The deduction for expenses did not include real estate taxes, which were separately claimed in the amounts of $1,428 for 1962 and 1963 and of $1,367.07 for 1964.

The Commissioner in his notice of deficiency disallowed the taxpayers' claimed rental losses as set forth above, with the explanation that the taxpayers had "not established that the property was acquired or is operated with the reasonable expectation or purpose of realizing a profit, and because the property was acquired and is used primarily for personal reasons." This disallowance created deficiencies of $3,130.07, $318.64 and $5,719.25 for the years 1962–64, respectively.

The Tax Court upheld the Commissioner's deficiency assessments.

The issue raised by the taxpayers on this appeal is whether the taxpayers are entitled to the expense and depreciation deductions under the applicable parts of §§ 162, 167 and 212 of the Internal Revenue Code of 1954. The statutes involved provide as follows:

"§ 162. *Trade or business expenses*

"(a) In general—There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business
\* \* \*

\* \* \* \* \* \*

"§ 167. *Depreciation*

"(a) General rule—There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)—

"1. of property used in the trade or business, or

"2. of property held for the production of income.

"§ 212. *Expenses for production of income*

"In the case of an individual, there shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year—

\* \* \* \* \* \*

"2. for the management, conservation, or maintenance of property held for the production of income."

Resolution of this case requires a determination of whether the Sea Island property was the taxpayers' "trade or business" or whether that property was "held for the production of income."

The Tax Court upheld the Commissioner on the grounds that the taxpayers had not established that they acquired their Sea Island property with the intent to make a profit, and that it had not been converted thereafter to a profit motivated activity.

■ This Court will overturn the Tax Court's findings of fact only when they are clearly erroneous. O'Madigan v. C. I. R., 300 F.2d 154 (6th Cir.). This rule applies to factual inferences to be drawn from the evidence. Commissioner of Internal Revenue v. Duber-

stein, 363 U.S. 278, 291, 80 S.Ct. 1190, 4 L.Ed.2d 1218; R. C. Owen Co. v. C. I. R., 351 F.2d 410, 414 (6th Cir.), cert. denied, 383 U.S. 967, 86 S.Ct. 1272, 16 L.Ed.2d 308. Moreover where a taxpayer assails the Commissioner's assessment of deficiencies, the burden rests upon the taxpayer to prove that the assessment is erroneous, inasmuch as the Commissioner's determination carries a presumption of validity. Drybrough v. C. I. R., 376 F.2d 350, 360 (6th Cir.).

The deductions claimed by the taxpayers on their returns for the years in question represented an allocation of 50 per cent of the depreciation and operating expenses. It is claimed in their petition that the proper allocation should have been on the basis of two-thirds of the annual operating expenses and depreciation, since the property was reserved to their personal use for only one-third of each of the tax years in question. This would have the effect of increasing the losses claimed to have been sustained by the taxpayers.

In order to rule in favor of the taxpayers on this point, however, it would be necessary to find that they meet the tests of holding property for the "production of income" or that the operation of the property was their "trade or business" as set out in the statutes quoted above. Taxpayers have concentrated their argument on the proposition that their Sea Island property was "held for the production of income," and have not urged that the expenses or depreciation were related to their "trade or business."

■ The taxpayers must demonstrate that they had a profit seeking motive in holding their Sea Island property; see Schley v. C. I. R., 375 F.2d 747 (2d Cir.); George W. Mitchell, 47 T.C. 120, 128; or that subsequent to its acquisition it was converted to a holding for the production of income. Briley v. United States, 298 F.2d 161, 163 (6th Cir.); see also, May v. C. I. R., 299 F.2d 725 (4th Cir.), affirming 35 T.C. 865.

■ If the predominant purpose and use of the property was for recrea-

tion, a hobby or some other nonprofit motive and not to derive income, no deductions may be taken. Treas.Reg. 1.-212.1; see, Hirsh v. Commissioner, 315 F.2d 731 (9th Cir.). The Commissioner apparently concedes that the taxpayers can make a dual use of property and that an allocation of the expenses and depreciation is permissible to that part of its use which relates to earning income or making a profit. See, Your Federal Income Tax, Internal Revenue Service Publication No. 17, 1968 ed., p. 64. The record demonstrates to our satisfaction that the taxpayers failed to prove that such is the situation here. It has been recognized that the absence of a profit is not determinative, but the operation must be of such nature that in good faith the taxpayer could expect a profit. Lamont v. C. I. R., 339 F.2d 377 (2d Cir.). See, Henry P. White, 23 T.C. 90, aff'd per curiam, 227 F.2d 779 (6th Cir.), cert. denied, 351 U.S. 939, 76 S.Ct. 836, 100 L.Ed. 1466.

Taxpayers urge that concurrently with their purchase John Carkhuff consulted their tax advisor, that a depreciation schedule was prepared and that a method of accounting was devised for receipts and disbursements of the operation of the Sea Island property. This indicates an intention that the operation was to be conducted in a businesslike manner. c. f., Schley v. C. I. R., *supra*, 375 F.2d at 750. This argument, however, is a double edged sword. While it demonstrates the relative sophistication with which the taxpayers undertook to operate their property, it also tends to show that they did not enter blindly upon the venture. In short, the taxpayers were not ignorant of the reasonable prospects of profit and loss. The inference is against the possibility that the resulting "losses" reflected simply an unwise investment. For the three years at issue taxpayers claimed losses of $3,-912.60, $5,088.05 and $7,495.80. If the real estate taxes are added to these losses, the total losses from the operation of the Sea Island property become $5,340.-60 for 1962, $6,516.05 for 1963 and $8,-

862.87 for 1964, or a total loss of $20,-719.52 for the three years. In view of the magnitude of these losses and the taxpayers' financial circumstances, we think there was a complete failure of proof that they had any expectation that the ownership of the Sea Island property was to be an income producing operation.

The taxpayers urge that the finding by the Tax Court that the property was listed as being available for rent, and was rented for some period of time, compels the conclusion that it was held for the production of income. This contention is inconsistent with the Treasury Regulations, which provide as follows:

> "The question whether or not a transaction is carried on primarily for the production of income or for the management, conservation, or maintenance of property held for the production or collection of income, rather than primarily as a sport, hobby, or recreation, is not to be determined solely from the intention of the taxpayer but rather from *all the circumstances of the case.* For example, consideration will be given to the record of prior gain or loss of the taxpayer in the activity, the relation between the type of activity and the principal occupation of the taxpayer, and the uses to which the property or what it produces is put by the taxpayer." (Emphasis supplied.) Treas. Reg. 1.212.1(c)

The taxpayers' property was listed with the rental department of the Sea Island Company. The record shows that the renting of taxpayers' property was not a primary, or even major, concern of the Company. Its advertisements and direct mailings were not designed specifically for the purpose of renting cottages. The cottage listed by the taxpayers was not individually mentioned. The record indicates that the rental of cottages was incidental to the main program of attracting guests to the Sea Island Resort. The attracting of guests and vacationers to the Island sometimes could result in the rental of Cottage 83. We think this rental effort was not sufficient, standing alone, to sustain the taxpayers' burden. See, Jones v. United States, 279 F.Supp. 772, 774 (D.C.Del.); Mary Laughlin Robinson, 2 T.C. 305, 307.

It is noteworthy that of four and one-half months of peak rental periods, taxpayers reserved the cottage for their personal use for two of those months, an action not entirely consistent with a profit making motive.

Taxpayers further urge that they made improvements in the cottage in order to make it more attractive for rent and to keep it in a competitive position. While a rental motive is a permissible inference from the fact that repairs were made, a profit motive is a less certain inference. Assuming a motivation to rent, this may have been simply for the purpose of minimizing the cost of maintaining a resort home. The taxpayers had the burden of proving a profit motive. The making of repairs permits of at least one other inference consistent with the determination of the Tax Court. The taxpayers, who reported income from dividends ranging from $225,000 to $254,000 during the years in question, are obviously persons of substantial means. The repairs and maintenance, as well as the installation of equipment, which would make the cottage suitable for rental, also could have been intended to satisfy the personal tastes and comfort of the taxpayers while they occupied the cottage during four months of the year. The making of repairs and improvements does not necessarily demonstrate a rental intent and assuredly does not compel the conclusion that a profit motive was present.

We hold that the findings of the Tax Court are not clearly erroneous, but are supported by substantial evidence.

Affirmed.